Russell A. Robinson, 163937
Law Office of Russell A. Robinson, APC
345 Grove Street, First Floor
San Francisco CA 94102
Telephone: 415.255.0462
Facsimile:  415.431.4526

Counsel for Plaintiff
ED SUMMERFIELD

# UNITED STATES DISTRICT COURT

# NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| ED SUMMERFIELD, ARTHUR SUMMERFIELD, and RITA SUMMERFIELD<br><br>　　　　　Plaintiffs,<br><br>v.<br><br>STRATEGIC LENDING CORPORATION, ALI WEICHLER, LEONARDO "LEO" AGUSTIN, ERIC SWENSEN, and DOES 1 - 30,<br><br>　　　　　Defendants.<br>_____ | NO.　　C-09-2609-HRL<br><br>**FIRST AMENDED COMPLAINT FOR DAMAGES**<br><br>**DEMAND FOR JURY TRIAL**<br><br>[Employment] |

## I. INTRODUCTION

1.　On information and belief, Defendant STRATEGIC LENDING CORPORATION (SLC), at all times herein relevant, was a corporation formed under the laws of the State of California, principal place of business in Campbell, California, County of Santa Clara; Defendant ALI WEICHLER is a resident of the County of Santa Clara, at all relevant times was the person affiliated with, and/or employed by, SLC who hired, supervised, managed, and induced Plaintiff to act; and, Defendants LEONARDO AGUSTIN (Agustin or "Leo") and ERIC SWENSEN were, on information and belief, affiliated and

partnered with Weichler in the operation, ownership, and control of SLC.

2. Plaintiffs ED SUMMERFIELD, ARTHUR SUMMERFIELD, and ARTHUR SUMMERFIELD, are, and at all times relevant were, a California resident.

3. The true names and capacities of Defendants sued herein as DOES 1-30 ("DOE defendants") are unknown to Plaintiffs, who therefore sues said Defendants by such fictitious names, and Plaintiffs will seek leave to amend this complaint to show their true names and capacities when the same are ascertained. On information and belief, each DOE defendant was an employee/agent of the other defendants, and at all material times acted within the course and scope of that relationship.

4. Plaintiffs are informed and believes each Defendant sued herein was wrongfully or otherwise responsible in some manner for events and happenings as hereinafter described, and proximately caused injuries and damages to Plaintiffs.

5. Plaintiffs are informed and believes, and thereon alleges, that each Defendant was at all material times an agent, servant, employee, partner, joint venturer, co-conspirator, and/or alter ego of the remaining Defendants, and in doing the things herein alleged, was acting within the course and scope of that relationship. Plaintiffs are further informed and believes, and thereon alleges, that each of the Defendants herein gave consent, aid, and assistance to each of the remaining Defendants, and ratified and/or authorized the acts or omissions of each Defendant as alleged herein, except as may be hereinafter otherwise specifically alleged.

6. At all material times, each Defendant was jointly engaged in tortious activity, resulting in the deprivation of Plaintiffs; rights and other harm.

---

FIRST AMENDED COMPLAINT FOR DAMAGES  P020.COMPL[2]
[Jury Trial demanded]
*Summerfield, et al., v. Strategic Lending, et al.*       2

## II. GENERAL ALLEGATIONS AND JURISDICTION

7. Many of the acts complained of herein occurred in and around the County of Santa Clara, in the State of California.

8. Plaintiffs' federal claims arise under, *inter alia,* 18 USC §1961, *et seq.,* presenting a federal question. The jurisdiction of this Court is predicated on 28 USC §1331. Plaintiffs' related state claims, arising from many of the same, common facts, are properly before the Court under the doctrine and rule of supplemental jurisdiction.

9. State claims were filed earlier by Ed Summerfield as part of the case *Summerfield v. Strategic Lending Corporation, et al.,* venued in the Superior Court of the State of California (No. 1-CV-07-084987), an action filed on April 30, 2007, and dismissed by Ed Summerfield without prejudice on June 12, 2009; thus all statutes of limitations were tolled. Further bases for tolling are described below.

## III. INTRA-DISTRICT ASSIGNMENT

9. This matter has been filed in the Court's San Jose Division, pursuant to Civil L.R. 3-2.

10. Plaintiffs are, and at all times mentioned in this complaint were, citizens of the United States.

11. A substantial part of the events giving rise to this action occurred in Santa Clara County, California, and at least one named defendant (Weichler) resided, continues to reside, in Santa Clara County. Venue is therefore proper under 28 USC §1391(b).

12. This complaint may be pled in the alternative pursuant to FRCivP 8(e)(2).

## IV. HISTORY

13. In 2002, Rita Summerfield's friend, Gisela, introduced Rita to

1 Gisela's son, Ali Weichler. Through this connection, Weichler learned Rita
2 and her husband, Arthur Summerfield owned a home in Sunnyvale, several
3 condominiums in the South Bay, a beach house in Southern California, and a
4 luxury penthouse in Munich, Germany, with a grand view of the Oktoberfest
5 fair grounds. Rita Summerfield and Arthur Summerfield were both born in
6 Europe, as was Gisela; on information and belief, Weichler planned to profit
7 from this fact.

8     14.    Through this social connection, Weichler also learned most of these
9 properties were owned outright by the Summerfields. Weichler, who
10 exercised control and ownership over Defendant Strategic Lending
11 Corporation, saw an opportunity to capitalize on the Summerfields' equity.
12 Ed Summerfield was already working in the mortgage industry at the time
13 Weichler met Ed. In May 2003, Weichler asked Ed Summerfield to leave his
14 position at Ed's employer, Novastar, and to join SLC; after several months,
15 in reliance on many promises and inducements from Weichler, Ed resigned
16 from Novastar. Weichler required Ed to obtain a real estate license.
17 Weichler initially guaranteed "a million dollars a year." Before starting with
18 Weichler and SLC, Ed called Weichler back to verify and Weichler guaranteed
19 "at least $60,000 the first year," around $200,000 the second year, and
20 more each year after; by year four, Weichler guaranteed Ed that Ed would
21 be earning a million dollars annually at a minimum and Ed would be trained
22 to "whatever million-dollar level" Ed wanted.

23     15.    On information and belief, Weichler planned to induce Ed to work
24 for SLC so that Weichler could sell junk loans (or mortgages) to Ed's equity-
25 rich parents.

26     16.    In reliance on Weichler's statements, Ed studied for the California
27 Real Estate exam, spending $1,000 altogether in material, classes, books,
28

1  gas, and other items.  Next, Ed went to Palm Springs for training as
2  instructed by Weichler, costing Ed nearly $1,000.
3     17.   At the end of August 2003, Ed asked Weichler when he would be
4  getting paid any money such as hourly wages and the money promised.
5  Weichler said not to worry.  Weichler then told Ed to bring all his files.  In
6  September 2003, Weichler again promised Ed that Weichler would get Ed to
7  a level of earning between $1 million and $6 million annually, but that it
8  would not be until year four because of the training required.  Weichler
9  spoke with extreme confidence and was believable.  As with many great
10 sales people, Weichler possessed a certain aura which, no matter how
11 incredible things seemed, enabled Weichler to convince people his words
12 were more truth than what people conceived.  Thus, Ed believed Weichler
13 when he left Novastar and Ed continued to believe Weichler until the end.
14    18.   Over the course of the relationship, Weichler took Ed on long drives
15 in Ed's car to lenders and personal places such as department stores, classic
16 car dealerships, and other places that were non work-related areas.  Ed paid
17 all transportation costs including food because Weichler promised Ed would
18 get the money back through deals and the gathering of new deals.
19    19.   Weichler would also have Ed practice copying other people's
20 signatures, writing them in loan applications, saying this is part of the job,
21 and that there's nothing wrong with it.
22    20.   Defendant SLC, through Weichler and other management, required
23 Ed to purchase software and other work-related materials; these expenses
24 were never reimbursed.  Weichler required Ed to buy expensive and fancy-
25 looking glasses.  Weichler instructed Ed to put these expenses on Ed's credit
26 card and Weichler promised that Ed would get paid later.
27 / / /
28

21. In late 2003, Weichler had a long, drawn-out discussion with Ed in Ali's office and said that Ed would not be allowed to date girls, nor have any relationships until he was rich; women will screw up the training. Weichler wanted Ed to golf, to join a fitness center, etc.

22. In January 2004, Weichler struck Ed over the head and got angry because Ed went on a date; Weichler forced Ed to dump a girlfriend as a condition of continued employment. Weichler said training would end immediately if Ed did not do what Weichler demanded. Weichler then showed Ed porn on the computer. These acts bullied and cowed Ed.

23. In January 2004, Ed joined the expensive fitness club Weichler required Ed to join in order to build a relationship with Weichler's realtor. The membership cost Ed $1,100 to join and $130 per month.

24. Weichler didn't like Ed's clothes, required to have great clothes, and required Ed to go to Macy's to get clothes. At other times, Weichler required Ed to purchase additional clothes and thus to spend additional monies.

25. In addition to making Ed spend [un-reimbursed] money on may items, Weichler belittled or hit Ed once in a while; Ed suffered extreme embarrassment. Ed purchased more clothes from Mervyn's and Macy's at Weichler's demand. Ed had endured Weichler's daily and hourly rants. At other times, Weichler grew furious if Ed did not copy signatures accurately. Weichler stressed Ed not show the loan processors. Clearly, Weichler used bullying tactics to intimidate Ed and to prevent Ed from being independent.

26. In April 2004, Weichler required Ed to buy a hidden camera to record himself in the office because he didn't like the way Ed walked. This cost $1,084.54, again un-reimbursed.

27. By August 2004, everyday became more and more unbearable; lots of things on a daily or hourly basis arose and Ed would be falsely blamed.

1  Weichler then demanded that Ed obtain a notary license and Ed did.

2      28.   In October 2004, Ed demanded his $60,000 because Weichler had
3  guaranteed that the last year.  It had been over a year.  Weichler again
4  stated and promised that the deals and money were coming soon.  Weichler
5  was then silent and went over to his computer and wrote a TO DO list.

6      29.   In early 2005, Weichler admitted to Ed that Weichler had no real
7  estate license.  Weichler continued to say he wanted Ed to sign a paper
8  stating that Ed would not sue SLC or Weichler or others at the company.  Ed
9  began suffering additional harassment at work, designed on information and
10 belief to get Ed to quit and to convince Ed not to sue.  Ed later learned, in
11 late 2005, that Weichler, Swensen, Agustin, Does 1-30, and each of them,
12 had been engaged in luring homeowners and mortgagees out of stable bank
13 notes and into hidden fees and interest loans, at great profit to Defendants.
14 Additionally, Ed learned that said defendants had falsified loan documents,
15 mis-stated applicant income, and engaged in other fraudulent and/or quasi-
16 criminal activity in order unlawfully to gain profit for themselves.

17     30.   On April 29, 2005, Ed received a termination letter, informing him
18 that he had been terminated from Strategic.  The letter also contained many
19 threats, similar in tone to bullying Weichler had used, as described above.
20 This letter threatened that if Ed sued SLC or anybody connected with SLC,
21 Ed would suffer terrible consequences.  This April 29, 2005, letter was a
22 threat, an effort to extort from Ed promises not to sue based on fraudulent
23 statements.  The letter falsely claimed Ed had no right to be compensated,
24 engaged in defamation of Weichler by describing real events at SLC, and that
25 if Ed did anything to seek redress, Ed would be prosecuted.

26     31.   While Ed worked for Weichler and the other defendants, Weichler
27 met with Rita and Arthur many times; in these meetings, Weichler convinced

28

Rita and Arthur, with whom Ed lived in Sunnyvale, California, to re-finance their home, to take a line of equity, and to borrow heavily on other property, all to the benefit and unlawful gain of Defendants.  On information and belief, this was part of Weichler's scheme and was the primary reason for Weichler and SLC to hire Ed; Ed's hiring was the beginning of the scheme.

32. Using promises to Ed as bait, Weichler convinced Rita and Arthur to refinance their home through SLC.  At the time of this transaction in 2004, Rita and Arthur were less than *one year* from paying off the mortgage on this property.  However, succumbing to Weichler's pressure and false promises that the loan was a "superior product" and that he would make Ed rich, Rita and Arthur bought Defendants' product.  On October 29, 2003, Ali initially tried to convince Rita and Arthur to refinance the family home through SLC.  Ali falsely promised that this new loan product was superior to the loan with Wells Fargo which was just months away from being paid-off.

33. The first junk note Weichler and Strategic sold the Summerfields was hugely profitable for the defendants.  Unfortunately, that loan was a terrible deal for the Summerfields.  That loan, which closed escrow on about December 26, 2003, was misrepresented by Weichler and SLC to be a superior product.  However, when that loan started to unravel, Weichler pushed through two more loans to the plaintiffs.  One was a re-finance of the first mortgage on the family home; the other loan was a second, or "Flex Equity" line.  These two new loans closed on about June 24, 2004.

34. Weichler had, by this time, so ingratiated himself into the Summerfield home that he was secretly meeting with Arthur.  Arthur, born January 1, 1931, previously suffered a debilitating injury at work and was, at the time of these dealings with Weichler, undergoing treatment for cancer. Weichler started Arthur day-trading.  Initially, Arthur had almost $1 million

1  in value.  Weichler continued to prey upon Arthur.  On information and
2  belief, Weichler's conduct had two possible outcomes, both of which Weichler
3  planned to use to his benefit.

4  35.   If Arthur's secret day-trading paid-off, Weichler would look like a
5  genius and be able to continue to profit from the plaintiffs through selling
6  them additional loan products they did not need.  If Arthur's secret day-
7  trading failed, Weichler would be able to sell more junk mortgages to the
8  plaintiffs to cover Arthur's losses.

9  36.   In day-trading, Arthur – who at all relevant times acted at direction
10 of Weichler – lost over $500,000  The online brokerage firm exercised its
11 right and made a margin call on Arthur.  Having not worked since 1992
12 because of his injuries, Arthur needed to borrow money.  To meet Arthur's
13 needs, Weichler was ready with another predatory loan.

14 37.   Throughout 2004 and into April 2005, Weichler, exercising control
15 over SLC, preyed upon the Summerfields. Then, the Summerfields stopped
16 buying his loans.  They simply were unable to keep borrowing.  Swensen,
17 Agustin, and Weichler, unable to profit any longer from Rita and Arthur –
18 and having not made good on their promises to Ed – terminated Ed in late
19 April 2005, as described above.

20 38.   After Ed was terminated, Weichler continued to re-assure Rita and
21 Arthur, fraudulently, loans he and SLC had sold were good, solid loans.
22 These fraudulent reassurances, via telephone and using the personal
23 connection of Weichler's mother, Gisela, kept Plaintiffs ignorant of the true
24 nature of the predatory and fraudulent loan products they had been sold
25 until about August 16, 2005, when Weichler falsely re-assured Rita via
26 telephone that the loan secured by the family residence was a "superior
27 product."

28

39. The properties owned by Plaintiffs were in a family trust created by Arthur and Rita.  Ed, with his sister, was one of two primary trust beneficiaries and derived income from the trust when, for example, monies were dispersed; thus, he had a present property interest destroyed by Defendants.

40. In generating these junk loans for Plaintiffs, SLC, under Swensen and Weichler in particular, falsely inflated values of some of Plaintiffs' assets. This was part of an ongoing scheme to defraud both borrowers and lenders. Using facsimile transmissions, Swensen and Weichler forwarded false information to lenders about Plaintiffs in connection with the 2004 primary residence mortgage.  Ed later learned that Weichler and Swensen did this with regard to other borrowers as well.  For example, one borrower, WJD, had credit scores all below 600, one as low as 544.  Weichler was directly involved with the loan procured by SLC for WJD in January 29, 2005, and coached WJD on how to artificially inflate one's credit scores.  Another, similar fraudulent loan procured by Swensen involved one to KDR, in Emerald Hills, California.  Using the same scheme of forging documents, inflating asset value, and other devices, Swensen and SLC obtain a jumbo mortgage for KDR shortly after November 8, 2004.

41. Because of the fraudulent and frequent loan activity committed by Weichler and SLC, Plaintiffs lost their luxury condo in Munich and a beach house in Southern California; they were also unable to qualify for more reasonable loan packages because their credit had been damaged.

42. In making these junk loans, SLC violated the 72-hour disclosure law.  Weichler, who was not licensed in the State of California by 2003 to sell loans, did not have clients fill out and sign loan applications; he often filled out loan applications and signed borrowers' signatures prior to closing.  No

other disclosures were signed by the client with the exception of the borrower's authorization, of which he did via fax.  Furthermore, the borrower's credit report was pulled before a handwritten or initial loan application was ever filled out or signed by the clients.

43.   Under Weichler's instructions, loan applications were generally filled out and signed by Weichler.  Weichler did this with many clients, including WJD in order to obtain the January 2005 loan.   Because, on information and belief, they were trained by Weichler, both Agustin and Swensen engaged in the same fraudulent, unlawful practices.

44.   Under applicable law, a credit report must be pulled after authorization is taken and can be dated the same day.  A date on a loan application can be within three days of taking the application.  As a common, fraudulent practice, Swensen, Agustin, and Weichler would not use initial files except an authorization form.  They would then copy and use a signature from the authorization form on everything from verification forms such as VOEs to banks, employment, etc., to all loan applications as well.

45.   Swensen and Agustin trained employees at SLC to do it their "way." Under their direction, SLC employees pretended to be assistants, and gather information, quote rates, and perform the full range of loan officer activities.

46.   To avoid closer scrutiny by loan investors, these defendants inflated stated income and put the amount that would work to secure a loan into the application package, convincing clients to accept these false values.  Some of the things done in this regard were also done by Weichler in connection with the Plaintiffs' loans obtained through SLC; *e.g.,* inflate portfolio values and vehicle value.  In one case related to a December 8, 2004, loan, Swensen added two cars to a statement of assets that the applicant did not own.

45.   When Ed complained about these practices in early April 2005, he

was threatened by Weichler and Swensen, among others.  Agustin told him this is "the way everybody does it."   Defendants amassed a great deal of personal wealth and real property engaging in schemes to defraud borrowers and lenders alike.  While not all of these fraudulent devices were used in connection with loans Weichler and SLC forced upon and extorted from Plaintiffs, these schemes form part of the conspiracy engaged in by these defendants to commit a pattern and practice of racketeering.

## V.   CAUSES OF ACTION

**(1)   First Cause Of Action: Violations of 18 USC §§ 1962, et seq. (As To All Defendants by All Plaintiffs)**

46.   Plaintiffs re-allege and incorporate by reference all preceding paragraphs.

47.   In doing the acts alleged, Defendants Weichler, Swensen, Agustin, Does 1-30, and each of them unlawfully acquired, maintained interest in, controlled an "enterprise" through a pattern of racketeering activity in violation of 18 USC §1962(b).  Additionally, Defendants conducted the affairs of the enterprise, SLC, through a pattern of racketeering activity in violation of 18 USC §1962( c).

48.   SLC was, at all relevant times, an "enterprise" as defined to include "any partnership, corporation, association, or other legal entity, and any union or group of individuals associated in fact. . . " under 18 USC §1961(4).

49.   In doing acts alleged above, Defendants engaged in "Racketeering activity" such as mail fraud, wire fraud, extortion (by threatening to terminate Ed if he did not assist in obtaining loans from his parents in December 2003 and in June 2004), and interstate transportation and sale of fraudulently obtained goods.  On information and belief, this pattern of racketeering activity was comprised of more than two acts of racketeering

---

FIRST AMENDED COMPLAINT FOR DAMAGES                                          P020.COMPL[2]
[Jury Trial demanded]
*Summerfield, et al., v. Strategic Lending, et al.*              12

1  activity within a ten year period.

2  50. Additionally, said defendants conspired to perform these unlawful
3  acts, in violation of 18 USC §1962(d). They were able to damage Plaintiffs
4  through their unlawful activity by, *inter alia*, taking advantage of Arthur's
5  diminished mental capacity, using and abusing the trust Rita placed in
6  Weichler because of a personal relationship with Weichler's mother, and the
7  false promises Weichler made to Ed.

    A. When Ed complained to Swensen about the treatment by Weichler, Swensen informed Ed that it was part of the job;

    B. When Ed complained to Swensen and Agustin about fraudulent loan applications, such as those described above, both informed Ed that was how "everybody did it."

    C. Both Swensen and Agustin participated in the scheme or artifice knowingly, willingly, and with the intent to defraud lenders and borrowers alike, including the plaintiffs.

    D. In fact, Swensen was consulted by Ed in connection with the June 2004 loans made to Rita and Arthur by Weichler. Because Weichler was not licensed, Swensen had to complete the deals and did so. Ed questioned Swensen as to whether these were good loans for his parents and Swensen stated the loans were.

    E. In reliance on false assurances from Weichler and Swensen, Ed advised his parents to complete the loan procurement process through SLC.

51. As a direct, legal result of the unlawful activities of Defendants, Plaintiffs were injured and damaged according to proof.

52. Plaintiffs are further entitled to treble damages as someone injured in his business or property by reason of a violation of section 1962. 18 USC

---

FIRST AMENDED COMPLAINT FOR DAMAGES                        P020.COMPL[2]
[Jury Trial demanded]
*Summerfield, et al., v. Strategic Lending, et al.*      13

§1964(d).

**(2)  Second Cause Of Action:  Breach Of Fiduciary Duty**

**(As To All Defendants by All Plaintiffs)**

53.  Plaintiffs re-allege and incorporate by reference all preceding paragraphs.

54.  At the time Defendants, and each of them, dealt with Plaintiffs, and continuing through the present, each maintained a special, or fiduciary, relationship with Plaintiffs.  As fiduciaries, each defendant had a duty to act with loyalty and honesty and in a manner consistent with the best interests of Plaintiffs.  Putting their own interests before Plaintiffs', Defendants and each of them caused Plaintiffs to suffer adverse consequences, caused Plaintiffs to spend unnecessary monies, and caused other losses as a result of these breaches.

55.  By undermining Plaintiffs' situation through the above-mentioned conduct, by failing properly to disclose material matters, and by doing the acts alleged above and other things, said defendants breached the fiduciary duty each owed to Plaintiffs.  It became clear after Ed was terminated by Defendants that Defendants had failed to disclose many material facts – such as the fact that Weichler was a not a licensed realtor, that Ed would not be paid, that Ed would never be properly trained, and that Defendants never intended to pay Ed the kind of money they promised him – in efforts to put Defendants' pecuniary interests before the interests of their employee, Ed herein.  As a direct, legal result of these breaches, Ed was damaged in an amount according to proof at trial.  So, too, all Plaintiffs were damaged by the false and unlawful loan packages Defendants into which forced Plaintiffs.

WHEREFORE, Plaintiffs pray for relief and judgment as set forth below.

FIRST AMENDED COMPLAINT FOR DAMAGES                                         P020.COMPL[2]
[Jury Trial demanded]
*Summerfield, et al., v. Strategic Lending, et al.*            14

**(3) Third Cause Of Action: Breach Of Contract**

**(As To All Defendants by Plaintiff Ed Summerfield, Only)**

56. Plaintiff Ed Summerfield re-alleges and incorporates by reference all preceding paragraphs.

57. Ed and Defendants were parties to a contract, or series of agreements. The terms of the partly written, partly oral, and partly implied contract(s) upon which Plaintiff relied included, but were not limited to, the following: Defendants would pay Plaintiff for his work, reimburse Plaintiff for his expenses, and would train Plaintiff so that Plaintiff would earn an annual salary of over $1 million after four (4) years.

58. Defendants, and each of them, did not perform as promised despite Plaintiff's complete performance and reliance on Defendants' promises. As a direct result, Plaintiff was damaged in an amount according to proof at trial.

59. Defendants, and each of them, did not use their best skill and due diligence in training Plaintiff. An implied term of the agreement required the defendants to use their best skill and due diligence in assisting and in training Plaintiff; Defendants breached this part of the agreement. 30. Defendants, and each of them, breached the contract with Plaintiff by committing the acts alleged above.

60. As a direct, legal, and proximate result of the breaches by Defendants, and each of them, Plaintiff suffered and will continue to suffer substantial financial losses and damage caused by the conduct of Defendants and each of them.

WHEREFORE, Plaintiff prays for relief and judgment as set forth below.

///

---

FIRST AMENDED COMPLAINT FOR DAMAGES                                    P020.COMPL[2]
[Jury Trial demanded]
*Summerfield, et al., v. Strategic Lending, et al.*          15

**(4) Fourth Cause Of Action: Breach Of The Implied Covenant Of Good Faith And Fair Dealing**

**(As To All Defendants by All Plaintiffs)**

61. Plaintiffs re-allege and incorporate by reference all preceding paragraphs.

62. As a result of the relationship between Plaintiffs and Defendants, the expressed and implied promises made in connection therewith, and the acts, conduct, and communications resulting in these implied promises, said Defendants promised to act in good faith toward and deal fairly with Plaintiffs requiring, *inter alia*, the following:

   a. Each party in the relationship act with good faith toward the other concerning all matters arising from the relationship;

   b. Each party in the relationship act with fairness toward the other concerning all matters arising from the relationship;

   c. No party take any action to unfairly prevent any other party to the relationship from obtaining the benefits of the relationship;

   d. Defendants, and each of them, would comply with their own promises, representations, and developed customs in dealing with Plaintiff;

   e. Defendants, and each of them, would not misappropriate or subvert Plaintiff's expectations in the agreement; and,

   f. Defendants, and each of them, would give Plaintiff's interests as much consideration as they gave their own.

63. The conduct by Defendants, and each of them, was wrongful, in bad faith, and was a violation of said Defendants' legal duties. Plaintiffs further allege that said Defendants breached the covenant of good faith and fair dealing when they acted as alleged above.

---

FIRST AMENDED COMPLAINT FOR DAMAGES                                                P020.COMPL[2]
[Jury Trial demanded]
*Summerfield, et al., v. Strategic Lending, et al.*         16

64. The breaches of the covenant of good faith and fair dealing by Defendants, and each of them, were a substantial factor in causing damage to Plaintiffs. As a direct, legal, and proximate result of said breaches, Plaintiffs lost substantial benefits in an amount to be proven at trial.

WHEREFORE, Plaintiffs pray for relief and judgment as set forth below.

### (5) Fifth Cause Of Action: Unpaid Wages, Un-Reimbursed Expenses, And Related Labor Code Claims
### (As To All Defendants by Plaintiff Ed Summerfield, Only)

65. Plaintiff Ed Summerfield re-alleges and incorporates by reference all preceding paragraphs.

66. During the time Strategic employed Ed, Ed was compelled to work in several capacities, including but not limited to as described above and other services. Defendants never paid Ed for these services, failed to keep track of Plaintiff's hours in violation of Labor Code §1174, did not reimburse expenses, and did not pay Plaintiff overtime or for meal/rest periods in violation of IWC Order 5, §11. Plaintiff is informed and believes that Defendants did these things to Plaintiff as part of an ongoing practice; and, that this unlawful practice continued.

67. Plaintiff is owed wages by Defendants pursuant to Labor Code §§ 200, et seq., and waiting time penalties, pursuant to Labor Code §203.

68. Pursuant to Labor Code §1194, Plaintiff seeks the payment of all unpaid wages and overtime, as well as attorneys' fees, interest, and costs.

69. Pursuant to Labor Code §1194.2(a), because Defendants made payment to Plaintiff of a wage less than the minimum wage fixed by an order of the commission, Plaintiff shall be entitled to recover liquidated damages in an amount equal to the wages unlawfully unpaid and interest thereon.

70. Plaintiff thus claims wages, unpaid wages, penalties, interest, costs, attorneys' fees, and other statutory damages in an amount according to proof.

WHEREFORE, Plaintiffs pray for relief as hereinafter alleged.

1. For all damages in an amount according to proof, and for treble damages as allowed under 18 USC §1964(d);
2. For costs of suit, including reasonable attorneys' fees;
3. For pre-judgment interest as allowed under the law;
4. For disgorgement of fees paid and costs expended in needless and wasteful refinances caused by Defendants' acts and errors;
5. For punitive damages; and,
6. For such further relief as the Court deems just and proper.

Dated:  April 16, 2010        /s/ Russell A. Robinson
                              By:    Russell A. Robinson
                              Counsel for Plaintiffs
                              ED SUMMERFIELD, ARTHUR SUMMERFIELD, and
                              RITA SUMMERFIELD

## VI.  DEMAND FOR JURY TRIAL

PLEASE TAKE NOTICE that Plaintiffs hereby demand a trial by jury in this matter.  Plaintiffs request that the matter be designated as a jury action upon the Court's docket.

Dated:  April 16, 2010        /s/ Russell A. Robinson
                              By:    Russell A. Robinson
                              Counsel for Plaintiffs
                              ED SUMMERFIELD, ARTHUR SUMMERFIELD, and
                              RITA SUMMERFIELD

/ / /

**VII. CERTIFICATION OF INTERESTED ENTITIES OR PERSONS**

Pursuant to Civil L.R. 3-16, the undersigned certifies that as of this date, other than the named parties, there is no such interest to report.

Dated: April 16, 2010         /s/ Russell A. Robinson
                         By:   Russell A. Robinson
                         Counsel for Plaintiffs
                         ED SUMMERFIELD, ARTHUR SUMMERFIELD, and
                         RITA SUMMERFIELD

---

FIRST AMENDED COMPLAINT FOR DAMAGES                                    P020.COMPL[2]
[Jury Trial demanded]
*Summerfield, et al., v. Strategic Lending, et al.*         19