1 | Russell A. Robinson, 163937
Law Office of Russell A. Robinson
2 | 345 Grove Street, First Floor
San Francisco CA 94102
3 | Telephone: 415.255.0462
Facsimile:   415.431.4526
4 |
Counsel for Plaintiffs
5 | ED SUMMERFIELD, ARTHUR
SUMMERFIELD, and RITA SUMMERFIELD
6 |
7 |
8 | **UNITED STATES DISTRICT COURT**
9 | **NORTHERN DISTRICT OF CALIFORNIA**
10 |
ED SUMMERFIELD, ARTHUR          )   **NO.   C-09-2609-HRL**
11 | SUMMERFIELD, and RITA          )
SUMMERFIELD                     )   **THIRD AMENDED COMPLAINT**
12 |                               )   **FOR DAMAGES**
         Plaintiffs,              )
13 | v.                            )   **DEMAND FOR JURY TRIAL**
                                  )
14 | ALI WEICHLER, LEONARDO "LEO"  )   [Employment]
AGUSTIN, and DOES 1 - 30,        )
15 |                               )
         Defendants.              )
16 | _____ )

17 |
18 |
19 |
20 |
21 |
22 |
23 |
24 |
25 |
26 |
27 |
28 |

THIRD AMENDED COMPLAINT FOR DAMAGES                                P020.COMPL[3A]
[Jury Trial demanded]
*Summerfield, et al., v. Strategic Lending, et al.*          1

**I.  INTRODUCTION**

1.  On information and belief, STRATEGIC LENDING CORPORATION (SLC), at all times herein relevant, was a corporation formed under the laws of the State of California, principal place of business in Campbell, California, County of Santa Clara.  SLC has, on information and belief, been suspended by the California Secretary of State.  Defendant ALI WEICHLER is a resident of the County of Santa Clara, at all relevant times was the person affiliated with, and/or employed by, SLC who hired, supervised, managed, and induced Plaintiff to act; and, Defendant LEONARDO AGUSTIN (Agustin or "Leo"), with ERIC SWENSON were, on information and belief, affiliated and partnered with Weichler in the operation, ownership, and control of SLC.  Swenson, who was a defendant herein, filed for bankruptcy protection; his obligations to Plaintiffs were discharged by the federal bankruptcy court during the pendency of this action.

2.  Plaintiffs ED SUMMERFIELD, ARTHUR SUMMERFIELD, and ARTHUR SUMMERFIELD, are, and at all times relevant were, a California resident.

3.  The true names and capacities of Defendants sued herein as DOES 1-30 ("DOE defendants") are unknown to Plaintiffs, who therefore sues said Defendants by such fictitious names, and Plaintiffs will seek leave to amend this complaint to show their true names and capacities when the same are ascertained.  On information and belief, each DOE defendant was an employee/agent of the other defendants, and at all material times acted within the course and scope of that relationship.

4.  Plaintiffs are informed and believes each Defendant sued herein was wrongfully or otherwise responsible in some manner for events and happenings as hereinafter described, and proximately caused injuries and damages to Plaintiffs.

THIRD AMENDED COMPLAINT FOR DAMAGES                                P020.COMPL[3A]
[Jury Trial demanded]
*Summerfield, et al., v. Strategic Lending, et al.*          2

1       5. Plaintiffs are informed and believes, and thereon alleges, that each

2   Defendant was at all material times an agent, servant, employee, partner,

3   joint venturer, co-conspirator, and/or alter ego of the remaining Defendants,

4   and in doing the things herein alleged, was acting within the course and

5   scope of that relationship.  Plaintiffs are further informed and believes, and

6   thereon alleges, that each of the Defendants herein gave consent, aid, and

7   assistance to each of the remaining Defendants, and ratified and/or

8   authorized the acts or omissions of each Defendant as alleged herein, except

9   as may be hereinafter otherwise specifically alleged.

10      6. At all material times, each Defendant was jointly engaged in tortious

11  activity, resulting in the deprivation of Plaintiffs; rights and other harm.

12  **II.   GENERAL ALLEGATIONS AND JURISDICTION**

13      7. Many of the acts complained of herein occurred in and around the

14  County of Santa Clara, in the State of California.

15      8. Plaintiffs' federal claims arise under, *inter alia,* 18 USC §1961, *et seq.,*

16  presenting a federal question.  The jurisdiction of this Court is predicated on

17  28 USC §1331.  Plaintiffs' related state claims, arising from many of the

18  same, common facts, are properly before the Court under the doctrine and

19  rule of supplemental jurisdiction.

20      9. State claims were filed earlier by Ed Summerfield as part of the case

21  *Summerfield v. Strategic Lending Corporation, et al.,* venued in the Superior

22  Court of the State of California (No. 1-CV-07-084987), an action filed on

23  April 30, 2007, and dismissed by Ed Summerfield without prejudice on June

24  12, 2009; thus all statutes of limitations were tolled.  Further bases for

25  tolling are described below.  By order of this Court, dated August 20, 2010,

26  all state claims have been dismissed, without prejudice, because this Court

27  has declined to exercise jurisdiction over these state claims.

28

THIRD AMENDED COMPLAINT FOR DAMAGES                                      P020.COMPL[3A]
[Jury Trial demanded]
*Summerfield, et al., v. Strategic Lending, et al.*          3

III.   INTRA-DISTRICT ASSIGNMENT

9. This matter has been filed in the Court's San Jose Division, pursuant to Civil L.R. 3-2.

10.     Plaintiffs are, and at all times mentioned in this complaint were, citizens of the United States.

11.     A substantial part of the events giving rise to this action occurred in Santa Clara County, California, and at least one named defendant (Weichler) resided, continues to reside, in Santa Clara County. Venue is therefore proper under 28 USC §1391(b).

12.     This complaint may be pled in the alternative pursuant to FRCivP 8(e)(2).

IV.   HISTORY

13.     In 2002, Rita Summerfield's friend, Gisela, introduced Rita to Gisela's son, Ali Weichler.  Through this connection, Weichler learned Rita and her husband, Arthur Summerfield owned a home in Sunnyvale, several condominiums in the South Bay, a beach house in Southern California, and a luxury penthouse in Munich, Germany, with a grand view of the Oktoberfest fair grounds.  Rita Summerfield and Arthur Summerfield were both born in Europe, as was Gisela; on information and belief, Weichler planned to profit from this fact.

14.     Through this social connection, Weichler also learned most of these properties were owned outright by the Summerfields.  Weichler, who exercised control and ownership over Strategic Lending Corporation with Swenson and Agustin, saw an opportunity to capitalize on the Summerfields' equity.  Ed was already working in the mortgage industry at the time Weichler met Ed.  In May 2003, Weichler asked Ed Summerfield to leave his position at Ed's employer, Novastar, and to join SLC.  In May 2003, Weichler

THIRD AMENDED COMPLAINT FOR DAMAGES                                    P020.COMPL[3A]
[Jury Trial demanded]
*Summerfield, et al., v. Strategic Lending, et al.*          4

1  asked Ed Summerfield to leave his position at Ed's employer, Novastar, and

2  to join SLC; after several months, in reliance on many promises and

3  inducements from Weichler, Ed resigned from Novastar.  Weichler required

4  Ed to obtain a real estate license.  Weichler initially guaranteed via the

5  telephone on May 2, 2003, "a million

6  dollars a year." The same guarantees were made over the telephone on May

7  3, 4, and 6, 2003, as well as in several wire communications (e-mails).

8  Before starting with Weichler and SLC, Ed called Weichler back to verify and

9  Weichler guaranteed over the telephone on about July 14, 2003, "at least

10  $60,000 the first year," around $200,000 the second year, and more each

11  year after; by year four, Weichler guaranteed Ed that Ed would be earning a

12  million dollars annually at a minimum and Ed would be trained to "whatever

13  million-dollar level" Ed wanted.  Weichler made these representations to Rita

14  and Arthur as well, promising them via telephone on many occasions,

15  including July 17, 2003, that their son (Ed) would make these sums.

16      15.      On information and belief, Weichler planned to induce Ed to work

17  for SLC so that Weichler could sell junk loans (or mortgages) to Ed's equity-

18  rich parents.

19      16.      In reliance on Weichler's statements, Ed studied for the

20  California Real Estate exam, spending $1,000 altogether in material, classes,

21  books, gas, and other items.  Next, Ed went to Palm Springs for training as

22  instructed by Weichler, costing Ed nearly $1,000.

23      17.      At the end of August 2003, Ed asked Weichler when he would be

24  getting paid any money such as hourly wages and the money promised.

25  Weichler said not to worry.  Weichler then told Ed to bring all his files.  In

26  September 2003, Weichler again promised Ed that Weichler would get Ed to

27  a level of earning between $1 million and $6 million annually, but that it

28

---

THIRD AMENDED COMPLAINT FOR DAMAGES                     P020.COMPL[3A]
[Jury Trial demanded]
*Summerfield, et al., v. Strategic Lending, et al.*          5

1  would not be until year four because of the training required.  Weichler

2  spoke with extreme confidence and was believable.  As with many great

3  sales people, Weichler possessed a certain aura which, no matter how

4  incredible things seemed, enabled Weichler to convince people his words

5  were more truth than what people conceived.  Thus, Ed believed Weichler

6  when he left Novastar and Ed continued to believe Weichler until the end.

7       18.      Over the course of the relationship, Weichler took Ed on long

8  drives in Ed's car to lenders and personal places such as department stores,

9  classic car dealerships, and other places that were non work-related areas.

10 Ed paid all transportation costs including food because Weichler promised Ed

11 would get the money back through deals and the gathering of new deals.

12      19.      Weichler would also have Ed practice copying other people's

13 signatures, writing them in loan applications, saying this is part of the job,

14 and that there's nothing wrong with signing for other people.   Weichler was

15 so charismatic that Ed believed Weichler.

16      20.      SLC, through Weichler and other management such as Agustin,

17 required Ed to purchase software and other work-related materials;  these

18 expenses were never reimbursed.  Weichler required Ed to buy expensive

19 glasses.  Weichler instructed Ed to put these expenses on Ed's credit card

20 and Weichler promised via wire (e-mail) all through 2003 and 2004 that Ed

21 would be reimbursed.

22      21.      In late 2003, Weichler had a long, drawn-out discussion in his

23 office and basically said that Ed would not be allowed to date girls, nor have

24 any relationships until he was rich or it will screw up the training.  Weichler

25 wanted Ed to go golfing, join a fitness center, etc.

26      22.      In January 2004, Weichler struck Ed over the head and got

27 angry because Ed went on a date;  Weichler forced Ed to dump a girlfriend as

28

THIRD AMENDED COMPLAINT FOR DAMAGES                                    P020.COMPL[3A]
[Jury Trial demanded]
*Summerfield, et al., v. Strategic Lending, et al.*          6

1  a condition of continued employment.  Weichler said training would end

2  immediately if Ed did not do what Weichler demanded.  Weichler then

3  showed Ed porn on the computer.  These acts bullied and cowed Ed.

4        23.        In January 2004, Ed joined the expensive fitness club Weichler

5  required Ed to join in order to build a relationship with Weichler's realtor.

6  The membership cost Ed $1,100 to join and $130 per month to maintain the

7  membership.

8        24.        Weichler didn't like Ed's clothes, required to have great clothes,

9  and required Ed to go to Macy's to get clothes.  At other times, Weichler

10  required Ed to purchase additional clothes and thus to spend additional

11  money.

12        25.        In addition to making Ed spend [un-reimbursed] money on may

13  items, Weichler belittled or hit Ed once in a while; Ed suffered extreme

14  embarrassment.  Ed purchased more clothes from Mervyn's and Macy's at

15  Weichler's demand.  Ed had endured Weichler's daily and hourly rants.  At

16  other times, Weichler grew furious if Ed did not copy signatures accurately.

17  Weichler stressed that Ed not show the loan processors.  Clearly, Weichler

18  used bullying tactics to intimidate Ed and to prevent Ed from exercising

19  independent judgment.  The net impact on Ed was that Ed believed Weichler

20  and was intimidated into not challenging Weichler.

21        26.        In April 2004, Weichler required Ed to buy a hidden camera to

22  record himself in the office because he didn't like the way Ed walked.  This

23  cost $1,084.54, again un-reimbursed.

24        27.        By August 2004, everyday became more and more unbearable;

25  lots of things on a daily or hourly basis arose and Ed would be falsely

26  blamed.  When Weichler demanded Ed obtain a notary license, Ed did so.

27        28.        In October 2004, Ed demanded his $60,000 because Weichler

28

THIRD AMENDED COMPLAINT FOR DAMAGES                                    P020.COMPL[3A]
[Jury Trial demanded]
*Summerfield, et al., v. Strategic Lending, et al.*          7

1 | had guaranteed that the last year.  It had been over a year.  Weichler again

2 | stated and promised that the deals and money were coming soon. Weichler

3 | was then silent and went over to his computer and wrote a TO DO list.

4 | 29.      In early 2005, Weichler admitted to Ed that Weichler had no real

5 | estate license.  Weichler continued to say he wanted Ed to sign a paper

6 | stating that Ed would not sue SLC or Weichler or others at the company.  Ed

7 | began suffering additional harassment at work, designed on information and

8 | belief to get Ed to quit and to convince Ed not to sue.  Ed later learned, in

9 | late 2005, that Weichler, Swensen, Agustin, Does 1-30, and each of them,

10 | had been engaged in luring homeowners and mortgagees out of stable bank

11 | notes and into hidden fees and interest loans, at great profit to Defendants.

12 | Additionally, Ed learned that said defendants had falsified loan documents,

13 | mis-stated applicant income, and engaged in other fraudulent and/or quasi-

14 | criminal activity in order unlawfully to gain profit for themselves.

15 | 30.      On April 29, 2005, Ed received a termination letter, via the mail,

16 | informing him he had been terminated from Strategic.  The letter also

17 | contained threats, similar in tone to bullying Weichler had used, as described

18 | above.   This letter threatened that if Ed sued SLC or anybody connected

19 | with SLC, Ed would suffer terrible consequences.  This April 29, 2005, letter

20 | was a threat, an effort to extort from Ed promises not to sue based on

21 | fraudulent statements.  The letter falsely claimed Ed had no right to be

22 | compensated, engaged in defamation of Weichler by describing real events

23 | at SLC, and that if Ed did anything to seek redress, Ed would be prosecuted.

24 | 31.      While Ed worked for Weichler and the other defendants, Weichler

25 | met with Rita and Arthur many times; in these meetings, Weichler convinced

26 | Rita and Arthur, with whom Ed lived in Sunnyvale, California, to re-finance

27 | their home, to take a line of equity, and to borrow heavily on other property,

28 |

THIRD AMENDED COMPLAINT FOR DAMAGES                                    P020.COMPL[3A]
[Jury Trial demanded]
*Summerfield, et al., v. Strategic Lending, et al.*          8

1    all to the benefit and unlawful gain of Defendants.  On information and

2    belief, this was part of Weichler's scheme and was the primary reason for

3    Weichler and SLC to hire Ed; Ed's hiring was the beginning of the scheme.

4        32.        Almost from the beginning of the relationship between Weichler

5    and the Summerfields, Weichler frequently pulled Arthur aside and talked to

6    Arthur about day-trading stocks, promising to steer Arthur to solid buys and

7    great investments.  So, it was about the same time he began using false

8    promises to Ed as bait, Weichler started to convince Rita and Arthur to

9    refinance their home through SLC.  Arthur was disabled and undergoing

10   treatment for various ailments.  The sheer number and type of medications

11   made Arthur easy prey for the fast-talking and charismatic Weichler.  At the

12   time, Arthur was forgetful and trusting and slightly in awe of the boastful

13   and charismatic Weichler.

14       35.        Arthur, at the time suffering diminished capacity and lacking a

15   real understanding of what he was doing, had nonetheless managed to save

16   over $1 million in a brokerage account over a period spanning thirty plus

17   years – but he was susceptible to Weichler's influence.  Arthur, born January

18   1, 1931, previously suffered a debilitating injury at work and was, at the

19   time of these dealings with Weichler, undergoing treatment for cancer.

20       36.        Day-trading by Arthur, at Weichler's urging and with Weichler's

21   guidance, started in earnest in secret toward the end of 2003.  By itself, this

22   day-trading was not a violation of RICO; however, as alleged below, the

23   day-trading had significant impact upon the Summerfields' financial security.

24       37.        In secret and behind a closed door, Weichler visited Arthur for

25   months.  Plaintiffs Ed and Rita had no idea what was transpiring at the time

26   but later learned that Weichler and Arthur had literally blown through over

27   $500,000 in Arthur's brokerage account.  That is, in the course of day-

28

THIRD AMENDED COMPLAINT FOR DAMAGES                                    P020.COMPL[3A]
[Jury Trial demanded]
*Summerfield, et al., v. Strategic Lending, et al.*          9

1 │ trading, Arthur – who at all relevant times acted at direction of Weichler –

2 │ lost over $500,000.  Because Arthur, at Weichler's urging, had made many

3 │ stock purchases on margin, a series of margin calls drained Arthur's account

4 │ and impacted the Summerfield's wherewithal.  In fact, the plaintiffs suddenly

5 │ had a need for cash to satisfy these calls.  They needed to borrow money.

6 │     38.       The first loan Weichler and SLC sold to the plaintiffs was thus in

7 │ early 2004, secured by the Sunnyvale home in which Arthur and Rita resided

8 │ with Ed.  At the time of this transaction in 2004, Rita, Arthur, and Ed were

9 │ *one year* from paying off the mortgage on this property.  Succumbing to

10 │ Weichler's pressure and false promises the loan was a "superior product"

11 │ and that he would make Ed rich, Rita and Arthur bought Defendants'

12 │ product.

13 │     39.       The loan Weichler and Strategic sold the Summerfields was

14 │ hugely profitable for the defendants.  Unfortunately, that loan was a terrible

15 │ deal for the Summerfields.  For example, that initial loan had hidden fees in

16 │ excess of $12,000; this $12,000 was not disclosed by Defendants to

17 │ Plaintiffs on the estimated closing costs, but when the loan closed, that

18 │ $12,000 was pocketed by Defendants.

19 │     40.       This first junk note Weichler and Strategic sold the Summerfields

20 │ was hugely profitable for the defendants. Unfortunately, that loan was a

21 │ terrible deal for the Summerfields. That loan, used to finance the previously

22 │ hidden stock market losses by Arthur, and which closed escrow on about

23 │ December 26, 2003, was misrepresented by Weichler and SLC to be a

24 │ superior product.  Weichler told Plaintiffs in person and by telephone up until

25 │ December 26, 2003, that the loan would be a "bridge, easily re-financed

26 │ after a few months."  These were false statements, and part of the ongoing

27 │ pattern in which Defendants engaged.

28 │

THIRD AMENDED COMPLAINT FOR DAMAGES                                  P020.COMPL[3A]
[Jury Trial demanded]
*Summerfield, et al., v. Strategic Lending, et al.*          10

1    41.      On about December 1, 2003, Weichler, Swenson, Agustin, and

2   SLC used the wires (facsimile) to send estimated closing costs to the

3   Summerfields; these estimates were fraudulent.

4    42.      When that loan started to unravel, Weichler pushed through two

5   more loans to the plaintiffs. One was a re-finance of the first mortgage on

6   the family home; the other loan was a second, or "Flex Equity" line. These

7   two new loans closed on about June 24, 2004.

8    43.      These two loans or notes were obtained by Weichler and his

9   codefendants using wires (facsimile) and the telephone to mostly Rita on

10   May 19, 2004, May 20, 2004, May 22, 2004, May 22, 2004 again, May 29,

11   2004, and on fifteen separate occasions in June 2004, ending on June 23,

12   2004, when again false estimated closing costs and interest estimates were

13   transmitted used by Defendants essentially to steal the equity from Plaintiffs'

14   properties.  Ed's inheritance eventually was wiped out, as was his ability to

15   borrow from the equity in properties owned by Rita and Arthur.

16    44.      Weichler knew, because Ed had told Weichler, that Ed had been

17   able to use the equity in the properties owned by Rita and Arthur, to finance

18   Ed's endeavors.  When the loans sold by Weichler, Agustin, Swenson, and

19   SLC to the Summerfields caused the equity in the family home to disappear

20   (to be lost), and caused the loss to the family of several other properties, Ed

21   lost his sole means of financial support and security, which was particularly

22   troublesome for Ed because Defendants refused to pay him any earnings or

23   reimbursements for almost two years.

24    45.      After Ed was terminated, Weichler continued to re-assure Rita

25   and Arthur, fraudulently, loans he and SLC had sold were good, solid loans.

26   For example, while she was in Hawaii, Rita called Weichler in late June 2005.

27   Rita wanted to know why the interest rates and monthly payments were

28

---

THIRD AMENDED COMPLAINT FOR DAMAGES                                    P020.COMPL[3A]
[Jury Trial demanded]
*Summerfield, et al., v. Strategic Lending, et al.*          11

1 | rising when Weichler had repeatedly promised that these would not rise.

2 | Weichler falsely told Rita that the "bank had made an error" and that he

3 | would correct the problem with the bank.  Weichler knew that this was not a

4 | bank error, but rather a hidden cost of the loan which he had not disclosed

5 | to the plaintiffs at the time he sold them this loan.

6 | 46.      These fraudulent reassurances, via telephone and using the

7 | personal connection of Weichler's mother, Gisela, kept Plaintiffs ignorant of

8 | the true nature of the predatory and fraudulent loan products they had been

9 | sold until about August 16, 2005, when Weichler falsely re-assured Rita via

10 | telephone that the loan secured by the family residence was a "superior

11 | product."  Again, Rita was concerned because the payments continued to

12 | rise and the family's equity in the property was being eroded by adding to

13 | the principal certain elements of interest.  Weichler again falsely told Rita via

14 | the telephone that this was a financial institution – bank – error and that he

15 | would see it was corrected.

16 | 47.      The properties owned by Plaintiffs were in a family trust created

17 | by Arthur and Rita.  Ed, with his sister, was one of two primary trust

18 | beneficiaries and derived income from the trust when, for example, monies

19 | were dispersed; thus, he had a present property interest destroyed by

20 | Defendants as well as his access to credit secured by these properties.

21 | In generating these junk loans for Plaintiffs, SLC, under Swensen and

22 | Weichler in particular, falsely inflated values of some of Plaintiffs' assets.

23 | This was part of an ongoing scheme to defraud both borrowers and lenders.

24 | Using facsimile transmissions, Swensen and Weichler forwarded false

25 | information to lenders (and their underwriters in Nevada) about Plaintiffs in

26 | connection with the 2004 primary residence mortgage.

27 | 48.      Ed later learned that Weichler and Swensen did this with regard

28 |

---

THIRD AMENDED COMPLAINT FOR DAMAGES                                      P020.COMPL[3A]
[Jury Trial demanded]
*Summerfield, et al., v. Strategic Lending, et al.*          12

1   to other borrowers as well. For example, one borrower, WJD, had credit

2   scores all below 600, one as low as 544. Weichler was directly involved with

3   the loan procured by SLC for WJD in January 29, 2005, and coached WJD on

4   how to artificially inflate credit scores. Three wires (facsimile transmissions)

5   to lenders and underwriters on December 17, 2004, December 28, 2004,

6   and January 16, 2005, were instrumental in getting this fraudulent loan; all

7   three transmissions mis-represented assets and credit score information.

8       49.      Another, similar fraudulent loan procured by Swensen involved

9   one to KDR, in Emerald Hills, California. Using the same scheme of forging

10  documents, inflating asset value, and other devices, Swensen and SLC

11  obtain a jumbo mortgage for KDR shortly after November 8, 2004.

12      50.      Because of the fraudulent and frequent loan activity committed

13  by Weichler and SLC, Plaintiffs lost their luxury condo in Munich and a beach

14  house in Southern California; they were also unable to qualify for more

15  reasonable loan packages because their credit had been damaged.

16      51.      In making these junk loans, SLC violated the 72-hour disclosure

17  law. Weichler, who was not licensed in the State of California by 2003 to sell

18  loans, did not have clients fill out and sign loan applications; he often filled

19  out loan applications and signed borrowers' signatures prior to closing. No

20  other disclosures were signed by the client with the exception of the

21  borrower's authorization, of which he did via fax. Furthermore, the

22  borrower's credit report was pulled before a handwritten or initial loan

23  application was ever filled out or signed by the clients.

24      52.      Under Weichler's instructions, loan applications were generally

25  filled out and signed by Weichler. Weichler did this with many clients,

26  including WJD in order to obtain the January 2005 loan. Because, on

27  information and belief, they were trained by Weichler, both Agustin and

28

THIRD AMENDED COMPLAINT FOR DAMAGES                                    P020.COMPL[3A]
[Jury Trial demanded]
*Summerfield, et al., v. Strategic Lending, et al.*          13

1    Swensen engaged in the same fraudulent, unlawful practices.

2         53.        Under applicable law, a credit report must be pulled after

3    authorization is taken and can be dated the same day. A date on a loan

4    application can be within three days of taking the application. As a common,

5    fraudulent practice, Swensen, Agustin, and Weichler would not use initial

6    files except an authorization form. They would then copy and use a

7    signature from the authorization form on everything from verification forms

8    such as VOEs to banks, employment, etc., to all loan applications as well.

9         54.        Swensen and Agustin trained employees at SLC to do it their

10   "way." Under their direction, SLC employees pretended to be assistants, and

11   gather information, quote rates, and perform the full range of loan officer

12   activities.

13        55.        To avoid closer scrutiny by loan investors, these defendants

14   inflated stated income and put the amount that would work to secure a loan

15   into the application package, convincing clients to accept these false values.

16   Some of the things done in this regard were also done by Weichler in

17   connection with the Plaintiffs' loans obtained through SLC; *e.g.,* inflate

18   portfolio values and vehicle value. In one case related to a December 8,

19   2004, loan, Swensen added two cars to a statement of assets that the

20   applicant did not own.

21        56.        When Ed complained about these practices in early April 2005,

22   he was threatened by Weichler and Swensen, among others. Agustin told

23   him this is "the way everybody does it." Defendants amassed a great deal of

24   personal wealth and real property engaging in schemes to defraud borrowers

25   and lenders alike. While not all of these fraudulent devices were used in

26   connection with loans Weichler and SLC forced upon and extorted from

27   Plaintiffs, these schemes form part of the conspiracy engaged in by these

28

THIRD AMENDED COMPLAINT FOR DAMAGES                                      P020.COMPL[3A]
[Jury Trial demanded]
*Summerfield, et al., v. Strategic Lending, et al.*          14

1  defendants to commit a pattern and practice of racketeering. Plaintiffs have

2  learned that Agustin, Weichler, and Swenson owned several businesses

3  and/or properties together which were funded from monies obtained through

4  racketeering activity at SLC.

5      57.      In doing the acts alleged, Defendants and each of them

6  unlawfully acquired, maintained interest in, controlled an "enterprise"

7  through a pattern of racketeering activity in violation of 18 USC §1962(b).

8  Additionally, Defendants conducted the affairs of the enterprise, SLC,

9  through a pattern of racketeering activity in violation of 18 USC §1962( c).

10 SLC was, at all relevant times, an "enterprise" as defined to include "any

11 partnership, corporation, association, or other legal entity, and any union or

12 group of individuals associated in fact. . . " under 18 USC §1961(4).

13     58.      In doing acts alleged above, Defendants engaged in

14 "Racketeering activity" such as mail fraud, wire fraud, extortion (by *inter alia*

15 threatening to terminate Ed if he did not assist in obtaining loans from his

16 parents in December 2003 and in June 2004; and, by falsely claiming in the

17 April 29, 2005, letter to Ed that it was Ed who would be prosecuted if Ed

18 complained or filed any action), financial institution fraud, and interstate

19 transportation and sale of fraudulently obtained goods.  On information and

20 belief, this pattern of racketeering activity was comprised of more than two

21 acts of racketeering activity within a ten year period.  Defendants marketed

22 their loans to working-class borrowers such as the diminished-in-capacity

23 Arthur, people like Plaintiffs who did not speak English as a first language,

24 and people who may have been in seemingly desperate situations, like the

25 situation caused by Arthur's disastrous day-trading.  These people, like

26 Plaintiffs, the targets of Defendants, did not understand the computations

27 necessary to determine the financing cost of the loans being sold to them by

28

THIRD AMENDED COMPLAINT FOR DAMAGES                                P020.COMPL[3A]
[Jury Trial demanded]
*Summerfield, et al., v. Strategic Lending, et al.*        15

1  Defendants.  This type pf predatory lending constituted a scheme or artifice

2  to defraud persons such as Plaintiffs.

3      59.      Additionally, said defendants conspired to perform these

4  unlawful acts, in violation of 18 USC §1962(d). They were able to damage

5  Plaintiffs through their unlawful activity by, *inter alia,* taking advantage of

6  Arthur's diminished mental capacity, using and abusing the trust Rita placed

7  in Weichler because of a personal relationship with Weichler's mother, and

8  the false promises Weichler made to Ed.

9      A.   When Ed complained to Swensen about the treatment by
            Weichler, Swensen informed Ed that it was part of the job;

10

11     B.   When Ed complained to Swensen and Agustin about fraudulent
            loan applications, such as those described above, both informed
            Ed that was how "everybody did it."

12

13     C.   Both Swensen and Agustin participated in the scheme or artifice
            knowingly, willingly, and with the intent to defraud lenders and
            borrowers alike, including the plaintiffs.

14

15     D.   In fact, Swensen was consulted by Ed in connection with the
            June 2004 loans made to Rita and Arthur by Weichler. Because
            Weichler was not licensed, Swensen had to complete the deals

16          and did so. Ed questioned Swensen as to whether these were
            good loans for his parents and Swensen stated the loans were.

17

18     E.   In reliance on false assurances from Weichler and Swensen, Ed
            advised his parents to complete the loan procurement process
            through SLC.

19

20     60.      As a direct, legal result of the unlawful activities of Defendants,

21  Plaintiffs were injured and damaged according to proof.

22     WHEREFORE, Plaintiffs pray for relief as hereinafter alleged.

23     1. For all damages in an amount according to proof, and for treble

24  damages as allowed under 18 USC §1964(d);

25     2. For costs of suit, including reasonable attorneys' fees;

26     3. For pre-judgment interest as allowed under the law;

27     4. For disgorgement of fees paid and costs expended in needless and

28

---

1    wasteful refinances caused by Defendants' acts and errors;

2    5. For punitive damages; and,

3    6. For such further relief as the Court deems just and proper.

4

5

6    Dated:        October 4, 2010              /s/ Russell A. Robinson
     By:    Russell A. Robinson
     Counsel for Plaintiffs
7    ED SUMMERFIELD, ARTHUR
     SUMMERFIELD, and RITA SUMMERFIELD

8

9

10   **VI.    DEMAND FOR JURY TRIAL**

11       PLEASE TAKE NOTICE that Plaintiffs hereby demand a trial by jury in this

12   matter.  Plaintiffs request that the matter be designated as a jury action

13   upon the Court's docket.

14

15   Dated:        October 4, 2010              /s/ Russell A. Robinson
     By:    Russell A. Robinson
16   Counsel for Plaintiffs
     ED SUMMERFIELD, ARTHUR
17   SUMMERFIELD, and RITA SUMMERFIELD

18

19   **VII.   CERTIFICATION OF INTERESTED ENTITIES OR PERSONS**

20       Pursuant to Civil L.R. 3-16, the undersigned certifies that as of this date,

21   other than the named parties, there is no such interest to report.

22

23

24   Dated:        October 4, 2010              /s/ Russell A. Robinson
     By:    Russell A. Robinson
25   Counsel for Plaintiffs
     ED SUMMERFIELD, ARTHUR
26   SUMMERFIELD, and RITA SUMMERFIELD

27

28

THIRD AMENDED COMPLAINT FOR DAMAGES                          P020.COMPL[3A]
[Jury Trial demanded]
*Summerfield, et al., v. Strategic Lending, et al.*        17